1
2
3
4
5
6                  IN THE UNITED STATES DISTRICT COURT
7
8              FOR THE NORTHERN DISTRICT OF CALIFORNIA
9
10
11
12

**United States District Court**
For the Northern District of California

CENTER FOR BIOLOGICAL DIVERSITY,
a non-profit corporation, and
ENVIRONMENTAL DEFENSE CENTER, a
non-profit corporation,

             Plaintiffs,

   v.

U.S. FISH & WILDLIFE SERVICE, and
GALE A. NORTON, Secretary of the Interior,

            Defendants.
      and

COUNTY OF SANTA BARBARA, et al.,

            Applicants for Intervention.
_____/

No. C 04-04324 WHA

**ORDER (1) GRANTING
IN PART PLAINTIFFS'
MOTION FOR SUMMARY
JUDGMENT, (2) GRANTING
IN PART DEFENDANTS'
CROSS-MOTION FOR
SUMMARY JUDGMENT,
AND (3) REMANDING
IN PART TO FWS**

**INTRODUCTION**

      In this environmental case, the Center for Biological Diversity and the Environmental

Defense Center seek protection for the California tiger salamander.  Plaintiffs bring this action

pursuant to the Endangered Species Act of 1973, 16 U.S.C. 1531 *et seq.,* against Defendants

Gale Norton, Secretary of the Interior, and the United States Fish and Wildlife Service

("FWS").  Certain parties have been granted intervention as defendants.  This order sustains the

agency action in part and vacates it in other respects, as set forth below.

**STATEMENT**

The California tiger salamander (*Ambystoma Californians*) is an amphibian.  It is large and stocky with a broad, rounded snout.  It has small eyes with black irises that protrude from its head.  Its back and side are black with white or yellow spots or bars.  Its belly varies between white or yellow to a variegated pattern of white or yellow and black.  Adults reach an average length of eight inches.  Historically, the California tiger salamander has inhabited the coastal ranges in the Santa Rosa area of Sonoma County, southern San Mateo County south to San Luis Obispo County, and the vicinity of northwestern Santa Barbara.  Three populations are at issue: California tiger salamanders in (i) Santa Barbara County, (ii) Sonoma County, and (iii) elsewhere in Central California (69 Fed. Reg. 47214 (2004)).

The habitat of the California tiger salamander includes vernal pools and seasonal and perennial ponds and surrounding upland areas in grassland and oak savannah plant communities from sea level to about 3600 feet.  California tiger salamanders mate in vernal pools and similar waters.  The females lay their eggs in the water.  Females attach their eggs singly, or, in rare circumstances, in groups of two to four, to twigs, grass stems, vegetation or debris.  The eggs hatch in ten to fourteen days.  The hatched larvae are aquatic.  This stage lasts three to six months, the time it takes for a seasonal pool to dry up.  The larvae will perish if a site dries up before they complete metamorphosis.  Amphibian larvae must grow to a critical minimum body size before they can metamorphose to the terrestrial stage.  The longer the period in the vernal pool, the larger the larvae grow and the more likely they will survive.  Lifetime reproductive success is low.  Many California tiger salamanders breed only once in a lifetime with an average of eleven metamorphic offspring.  Less than five percent of the metamorphic offspring become breeding adults (*ibid*).

While vernal pools have been an essential element of its breeding habitat, where vernal pools have been destroyed, the California tiger salamander also uses other waters, such as stock ponds, for breeding.  Constructed as water sources for cattle, sheep, horses, and other livestock, stock ponds are now important breeding habitat for the California tiger salamander.  In order, however, for the stock ponds to be suitable for breeding, they must be maintained.  For

**United States District Court**
For the Northern District of California

2

United States District Court

For the Northern District of California

1    example, natural soil erosion on the bank edges and the presence of bullfrogs and fish impede

2    the California tiger salamander's ability to breed (*id.* at 47216).

3         After breeding, adults leave the water and return to small burrows in surrounding

4    uplands made by ground squirrels, gophers and other mammals.  Similarly, metamorphosed

5    juveniles leave the breeding sites in the late spring or early summer and migrate to upland

6    habitats.  The upland habitat of the California tiger salamander consists of grassland savannah

7    or grasslands with scattered oak trees and scrub or chaparral.  The California tiger salamander

8    co-habitats in the burrows with the small mammals, as stated.  Studies show that active

9    ground-burrowing rodent populations are required to sustain the salamanders.

10                        *          *          *

11        This case is but one chapter in a history of litigation and rule-promulgating regarding the

12   California tiger salamander.  Dr. H. Bradley Shaffer, a leading scientific expert on the

13   California tiger salamander, petitioned FWS in 1992 to list the California tiger salamander as

14   "endangered" throughout its range.  The following year, Dr. Shaffer requested that FWS list the

15   California tiger salamanders in Sonoma and Santa Barbara counties on an emergency basis.

16   FWS published a twelve-month finding on Dr. Shaffer's petition finding that the listing of the

17   California tiger salamander throughout its range in California was "warranted but precluded" by

18   more paramount concerns (Cen CTS FR 15720-15722).[1]

19        Six years later, in 2000, FWS promulgated an emergency rule designating the California

20   tiger salamander in Santa Barbara County as "endangered" (65 Fed. Reg. 3096 (2000)).  In the

21   same rule, FWS determined that the Santa Barbara salamander should be designated as a

22   "distinct population segment ('DPS')," as defined in the ESA (*id*. at 3106-7).  On March 19,

23   2003, FWS extended the protections of the emergency listing, issuing a final rule designating

24   Santa Barbara County distinct population of the California tiger salamander as "endangered"

25   (65 Fed. Reg. 57242).

26

27   _____

28        [1] This order adopts the citation system used in the administrative record.  Cen CTS, SBC CTS and SC
     CTS refer to the Central California, Santa Barbara County and Sonoma County tiger salamander, respectively.
     FR and PR refer to the final rule and proposed rule, respectively.

                                          3

United States District Court

For the Northern District of California

1    After FWS listed the Santa Barbara County tiger salamander "endangered" but not the

2   Sonoma County tiger salamander, the Center for Biological Diversity sued in an earlier action

3   in this Court (C-02-0558 WHA (N.D. Cal)), to compel the agency to protect the species in

4   Sonoma County and throughout the remainder of its range.  In June 2002, the Court approved a

5   consent decree setting deadlines for FWS:  (1) to determine whether the Sonoma salamander

6   warranted an emergency listing, (2) to submit for publication in the Federal Register a proposed

7   rule to list the California tiger salamander throughout its remaining range in California on or

8   before May 15, 2003, and (3) to make a final determination on the proposed rule by May 15,

9   2004 (Consent Decree, Docket No. 58 at 4).

10    In response, FWS listed Sonoma County distinct population as an "endangered" species

11   on an emergency basis and proposed to list it as "endangered" permanently (67 Fed. Reg. 28648

12   (2002)).  In March 2003, FWS listed the Sonoma County distinct population segment as

13   "endangered" (68 Fed. Reg. 13498 (2003)).  To fully satisfy the consent decree, FWS had to

14   determine the listing of the Central California tiger salamander as well, which it did in the

15   agency action at issue now.  As explained below, however, in doing so, FWS used the occasion

16   to down-list the Sonoma County and Santa Barbara County tiger salamanders.

17    In response to the "endangered" listings in Santa Barbara and Sonoma counties, a

18   coalition of public agencies, home builders, agricultural and labor interests challenged the

19   listing in the United States District Court for the Eastern District of California *(Home Builders*

20   *Association of Northern California, et al. v. Williams*, No. S-04-0345 LEK GG (E.D. Cal)).

21   CBD intervened in *Home Builders* as a defendant.  The suit alleged that California tiger

22   salamanders in Santa Barbara and Sonoma counties had been unlawfully listed, contending that

23   the populations did not comprise valid "distinct populations segments."  *Home Builders* was

24   eventually dismissed as moot in light of the rule at issue herein, referred to for convenience as

25   the "2004 rule."

26    The 2004 rule (1) eliminated the separate DPS status for Sonoma and Santa Barbara

27   counties and effectively merged them into a single range-wide species in California, (2) listed

28   the single range-wide species as "threatened," thus eliminating the "endangered" listing for the

United States District Court
For the Northern District of California

Santa Barbara County and Sonoma County DPSs, and (3) included a so-called Section 4(d) rule exempting routine ranching activities from the definition of a "taking" of the California tiger salamander.  While the 2004 rule was supposed, under the consent decree, to address only the Central California tiger salamander, it ended up revisiting the entire species, including the Santa Barbara and Sonoma populations and down-listing their protection.

Here is the detailed history.  The California/Nevada operations office of FWS generated multiple drafts of the proposed rule.  All of the drafts proposed "threatened" status for the California tiger salamander range-wide except for the Santa Barbara and Sonoma DPSs, which had been already been listed as "endangered."  On April 30, 2003, the regional office proposed this version to officials at the Department of the Interior in Washington.  On May 14, 2003, one day before the listing deadline, the Department of Interior responded with a revised draft that listed the Central California distinct population segment of the California tiger salamander as "threatened" and, for the first time, proposed to down-list the Sonoma and Santa Barbara tiger salamander from "endangered" to "threatened" (Cen CTS PR 1382–1524).  After additional edits were made by Assistant Secretary of the Interior, Craig Manson, the proposed rule, which included the proposed down-listing, was published in the Federal Register (68 Fed. Reg. 28648 (May 23, 2003)).[2]

Following publication of the proposed rule, the regional FWS office solicited peer review, public comment and convened its own internal scientific review team.  Plaintiffs state that "all scientific evidence before the agency weighed against reclassification" (Pl. Brief at 23).  While the record does not support this sweeping statement, it is true that after evaluation and analysis, the scientific review team's drafts of the final rule opposed any down-listing of the Sonoma County and Santa Barbara County salamanders.  In a memorandum dated May 6, 2004, the listing officer of the California/Nevada operations office notified the Secretary of the Interior that the proposed final rule listed the Central California tiger salamander as "threatened" but deferred any decision on the Sonoma County and Santa Barbara County tiger

---

[2] Craig Manson, is the Assistant Secretary for Fish, Wildlife, and Parks at the U.S. Department of the Interior, located in Washington D.C.  In his capacity as Assistant Secretary, he is responsible to the Secretary of the Interior for the administration of the Endangered Species Act (Manson Decl. ¶ 1).

salamander, stating "we are also preparing a notice to open another comment period on the proposed down-listing of the Sonoma and Santa Barbara distinct populations segments and on a proposal to consolidate the three DPSs into a single range-wide listing, should the two DPSs be down-listed" (Cen CTS FR 8863).

The Department of the Interior, however, did not wish to defer the decision on the Sonoma and Santa Barbara down-listing.  In an email sent four days before the deadline for the final rule, Assistant Deputy Secretary of the Interior Julie MacDonald directed the scientific review team to "prepare the final rule to list one 'threatened' population of the CTS, encompassing Central, Santa Barbara, and Sonoma, down-list the Santa Barbara and Sonoma populations and remove the DPS designation" (Cen CTS FR 9011).  It is clear from the record that the scientific review team rushed to respond to the Department of the Interior's new directive by the deadline (Cen CTS FR 9493).  In an internal email to the scientific review team working on the draft of the final rule, the assistant manager stated, "[The Assistant Deputy Secretary of the Interior's] highest priority is to consolidate the various listings into one range-wide listing . . . it [has become] apparent that this is going to require a fair amount of work, and I am not sure how good a job we can do in that time" (Cen CTS FR 9495).

On May 14, 2004, the day before the deadline for issuing the final rule, FWS filed a motion to extend the deadline by six months.  Without an extension, the version of the rule that FWS intended to publish the next day dealt solely with the Central California salamander (Cen CTS FR 9637, 9959).  While FWS argued that it needed the extension to resolve a factual discrepancy over the extent of any decrease in grazing land for the Central California tiger salamander, it is now evident, upon review of the transcript of the hearing and the administrative record, that FWS was simply buying time to draft a final rule that also incorporated the down-listing of the Santa Barbara County and Sonoma County tiger salamander populations.

The Court extended the deadline six weeks to resolve the purported factual issue of whether there was a fourteen percent decrease in grazing versus a one percent increase in grazing land regarding the Central California tiger salamander (No. C02-00558 WHA, June 14,

United States District Court

For the Northern District of California

1    2004 Order at 1).  The ensuing email correspondence, however, from the Department of the

2    Interior to the regional office clearly set forth a directive that had little to do with analyzing the

3    factual discrepancies and analysis of the data in front of the agency; rather, upon being granted

4    an extension, the Assistant Deputy Secretary of the Interior immediately gave a directive to the

5    scientific review team to draft a rule that down-listed all three populations to "threatened"

6    "per [Assistant Secretary Craig] Manson's previous instruction" (Cen CTS FR 10189).

7        The final rule was published on August 4, 2004.  The issue regarding the percentage of

8    grazing land proved inconsequential.  While the final rule included an analysis of this issue, it

9    concluded that "while the majority of these newly created grazing areas may have some utility"

10   for the tiger salamander populations . . . "they do not offset the loss of the portion of grazing

11   lands that [was] suitable habitat for the California tiger salamander habitat" (60 Fed.

12   Reg. 47213).

13       More importantly, the final rule reclassified the Santa Barbara and Sonoma salamanders

14   from "endangered" to "threatened," eliminated their separate listings as DPSs, and listed the

15   California tiger salamander range-wide as "threatened."  Pursuant to Section 4(d), which allows

16   such relaxed provisions for a "threatened" status, the rule also exempted routine ranching

17   activities from the "take" prohibitions under Section 9.

18       This action commenced on October 13, 2004.  Plaintiffs allege that FWS failed to

19   comply with Endangered Species Act, the Administrative Procedures Act and the National

20   Environmental Policy Act.[3]

21       On May 30, 2005, the Court permitted the following entities to intervene in the present

22   action as defendants:  County of Santa Barbara, County of Sonoma, Rohnert Park, Santa Rosa,

23   Blochman Union School District, Burbank Housing Development Corporation, Coalition of

24   Labor, Agriculture and Business of Santa Barbara County, Cobblestone Homes, Inc.,

25   Grower-Shipper Vegetable Association of Santa Barbara and San Luis Obispo Counties,

26

27            [3] Plaintiffs also challenged FWS's failure to designate a "critical habitat" for the California tiger
     salamander in Sonoma and Central California; however, on February 3, 2005, the Court approved the parties'
28   stipulated settlement and consent decree dismissing the "critical habitat" claim (Dkt. No. 26).

7

1    North Coast Builders Exchange, Northern California Engineering Contractors Association,

2    Santa Maria Valley Chamber of Commerce and Santa Rosa Chamber of Commerce.

3          Twelve of the intervenors were plaintiffs in *Home Builders*.  Intervenors argued that

4    they would suffer "economic and other injuries" if Plaintiffs prevailed in reinstating the rules

5    they had previously sued to overturn.  Generally, they alleged that if the previous rules were

6    reinstated, development and construction projects would be halted, delayed or increased in cost,

7    and significant areas of land and the use of such land would be impacted.

8          Plaintiffs have now moved for summary judgment.  In response, FWS concedes that

9    based on review of plaintiffs' claims and the administrative record (Def. Mot. 6):

10                   [it] has determined that it would be appropriate to reevaluate the
                     reclassification of the Santa Barbara and Sonoma populations from
11                   "endangered" to "threatened" and the elimination of those
                     populations' DPS status.  (Manson Decl. 3).  In retrospect, FWS
12                   did not adequately explain the basis for its decision to reclassify
                     the two populations (*id.*).
13

14         The federal defendants request a voluntary partial remand of the final rule to allow FWS

15   to revisit:  (1) its decision to eliminate the distinct populations segment status of the Sonoma

16   and Santa Barbara populations of the California tiger salamander, (2) its decision to reclassify

17   those populations from the status of "endangered" to "threatened," and (3) the application of the

18   special rule exempting routine ranching activities from the "taking" provision of the Sonoma

19   and Santa Barbara populations.  The federal defendants argue that the portion of the final rule

20   regarding the Central California tiger salamander and the Section 4(d) rule is valid.  During any

21   remand, which they estimate will take 20.5 months, the federal defendants request that the

22   Court permit the 2004 rule to remain in effect.  Intervenors join the federal defendants but raise

23   the threshold questions of ripeness and standing.

24         To support their position, FWS has submitted a declaration of Mr. Craig Manson,

25   Assistant Secretary for Fish, Wildlife and Parks at the Department of the Interior.  At the

26   hearing on the summary judgment motions, held on August 4, 2005, plaintiffs were permitted to

27   cross-examine Secretary Manson inasmuch as the declaration was outside the administrative

28   record.

**United States District Court**
For the Northern District of California

1    In summary, this order sustains jurisdiction and standing.  On the merits, this order holds

2    that neither the classification of the salamander in Central California as "threatened" nor the

3    Section (4)(d) rule as it applies to the Central California salamander is arbitrary and capricious.

4    On the other hand, this order vacates (1) the elimination of the designation of "distinct

5    population segments" for the Santa Barbara County and Sonoma County salamanders and

6    (2) the down-listing of the Santa Barbara County and Sonoma County salamanders.  This

7    vacatur is based on deficiencies in the administrative record and is without prejudice to any

8    renewed administrative proceedings on the same subject.

9                                         **ANALYSIS**

10        This order first addresses the threshold issues of standing and ripeness and then

11   addresses the validity of the 2004 rule within the framework of the Endangered Species Act and

12   the Administrative Procedures Act.

13       **1.    JUDICIABILITY.**

14           **A.    Standing**.

15        The intervenors claim that plaintiffs lack standing to sue under the ESA and the APA.

16   This order disagrees.  Standing involves two inquiries.  *First*, a court must ask whether a

17   plaintiff has suffered injury to satisfy the "case or controversy" requirement of Article III.  To

18   satisfy the case and controversy requirement of Article III standing, a plaintiff "must show that:

19   (1) he has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or

20   imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged

21   action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will

22   be redressed by a favorable decision."  *Friends of the Earth, Inc. v. Laidlaw Envt. Sys., Inc.*,

23   528 U.S. 167, 180–81 (2000).

24        *Second*, in addition to Article III standing requirements, courts often impose additional

25   jurisdictional limitations, referred to as "prudential" standing principles.  This

26   non-constitutional inquiry is satisfied when a particular plaintiff has been granted a right to sue

27   by a specific statute under which he or she brings suit.  *Cetacean Comty. v. Bush*, 386 F.3d

28   1169, 1175 (9th Cir. 2004).  A plaintiff's grievance must fall within the "zone of interests" of

**United States District Court**

For the Northern District of California

1    that statute.  The question is "whether the interest sought to be protected by the complainant is

2    arguably within the "zone of interests" to be protected or regulated by the statute or

3    constitutional guarantee in question."  *Ass'n of Data Processing Service Org., Inc. v. Camp*,

4    397 U.S. 150, 153 (1970).

5            Where an organization brings suit, there is yet another layer of analysis.  An

6    organization has standing to bring suit on behalf of its members when (a) its members would

7    otherwise have Article III standing to sue in their own right; (b) the interest it seeks to protect

8    are germane to the organization's purposes; and (c) neither the claim asserted nor relief

9    requested requires the participation of individual members.  *Hunt v. Washington State Apple*

10   *Adver. Comm'n*, 432 U.S. 333, 343 ( 1997).  In environmental cases, members have suffered an

11   injury in fact by showing that he has an aesthetic or recreational interest in a particular place, or

12   animal, or plant species, that interest is impaired by defendants' conduct, and that the injury will

13   likely be redressed by a favorable decision.  *Ecological Rights Found. v. Pacific Lumber Co.*,

14   230 F.3d 1141, 1147 (9th Cir. 2000); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).

15           Here, CBD and EDC, as associations, have standing to bring this action.  *First*, their

16   members have Article III standing to bring this action in their own right.  The declarations of

17   group members indicate that they have an aesthetic, recreational and psychological interest in

18   observing California tiger salamanders (Blaker Decl. Docket No. 12, Holmgren Decl. Docket

19   No. 49, Wright Decl. Docket No. 13).  The 2004 rule down-lists the California tiger salamander

20   from "endangered" to "threatened," which decreases the protection afforded the Santa Barbara

21   and Sonoma California tiger salamanders by permitting "takes" under the Section 4(d) rule.

22   The decreased protection impairs the members' ability to observe California tiger salamanders

23   — which is an injury in fact.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562-63 (1992).

24           Intervenors contest this point, arguing that "threatened" status affords the California

25   tiger salamanders the same protections as "endangered" status and that the Section 4(d) rule is a

26   "net conservation benefit and a net positive on [p]laintiffs' ability to view the CTS"

27   (Int. Reply. 3).  This order disagrees.  Some of the activities, now sanctioned by the

28   Section 4(d) rule, may harm the California tiger salamander or so FWS has found.  For example,

10

in its previous rule listing the Santa Barbara salamander as "endangered," FWS stated that plowing and discing can alter the upland habitats of the salamander and kill salamanders outright (65 Fed. Reg. 57252 (2000)).  In its previous emergency listing of the Sonoma tiger salamander as "endangered," FWS stated that introducing fish in stock ponds reduces growth and survival of the salamander (67 Fed. Reg. 47736 (2002)).

With regard to prudential considerations, plaintiffs fit squarely in the "zone of interests" for both the ESA and the APA.  The ESA includes a citizen suit provision which broadly states "any person may commence a civil suit on his own behalf . . . against the Secretary where there is alleged a failure of the Secretary to perform any act or duty under section 1533 of this title which is not discretionary with the Secretary."  16 U.S.C. 1540(g).[4]  The Supreme Court has held that the breadth of this provision in referring to "any person" negates the applicability of the "zone of interests" test to actions brought under the ESA.  *Bennett v. Spear*, 520 U.S. 154, 164 (1997).  The APA, by its own terms, provides a right to judicial review of all "final agency action for which there is no other adequate remedy in court."  5 U.S.C. 706.  With respect to ESA claims brought under the APA, the question is whether plaintiffs' claims are arguably protected by the ESA.  *Bennett*, 520 U.S. at 174.  There is no doubt that the overall purpose of CBD and the EDC — to advance species preservation — is the same as the aim of the ESA.

Plaintiffs satisfy the remaining elements necessary for standing as an association.  As discussed above, their members would otherwise have standing to sue in their own right.  In addition, the interests at stake are germane to the purpose of the CBD and EDC: to save the species from extinction.  Finally, CBD and EDC, as shown during this litigation, are capable of litigating this case vigorously without member participation.

**B.    Ripeness.**

Intervenors also claim that the case is not ripe for review and that this Court lacks jurisdiction to decide the matter.  Again, not so.  In order to determine whether a claim is ripe for judicial review two factors need to be evaluated:  (1) the fitness of the issue for judicial

---

[4] This action arises, in part, under the ESA's citizen suit provision, 16 U.S.C. 1540(g) (Pl. Reply 16). The citizen suit provision expressly authorizes judicial review of agency listing decisions. 16 U.S.C. 1450(g)(1). Accordingly, plaintiffs complied with the necessary notice requirements.

United States District Court

For the Northern District of California

11

1  decision and (2) the hardship to the parties of withholding court consideration.  An

2  administrative action is fit for judicial review if the agency action is final and the issues raised

3  are "purely legal." *Assiniboine & Sioux Tribes v. Bd. of Oil and Gas*, 792 F.2d 782, 789

4  (9th Cir. 1986).

5       Plaintiffs' claims are ripe.  *First*, FWS' decision to down-list the Sonoma and

6  Santa Barbara tiger salamander from "endangered" to "threatened" is fit for review.  The 2004

7  rule is published in the Federal Register as a "final rule."  Whether FWS properly promulgated

8  the 2004 rule is a purely legal issue.  *Second*, plaintiffs would be prejudiced by withholding

9  consideration, as the Sonoma and Santa Barbara populations have been down-listed to

10  "threatened," a listing that affords the tiger salamanders – which are close to extinction — less

11  protection.

12       **2.    ENDANGERED SPECIES ACT.**

13       Having found that a number of species of fish, wildlife, and plants in the United States

14  had become extinct "as a consequence of economic growth and development untempered by

15  adequate concern and conservation," Congress passed the Endangered Species Act in 1973.

16  16 U.S.C. 1531(a)(1).  The purpose of the ESA is to conserve "endangered" and "threatened"

17  species and the ecosystems upon which they depend and to provide a program for the

18  conservation of such "endangered" species and "threatened" species.  16 U.S.C. §1531(b).

19       **A.    Definition of DPS.**

20       Under the ESA the term "distinct population segment" is used to define "species:"  The

21  term "species" includes any subspecies of fish or wildlife or plants, and any *distinct population*

22  *segment* of any species of vertebrate fish or wildlife which interbreeds when mature.  16 U.S.C.

23  1532(16).  Since Congress did not define the term "distinct population segment," FWS and the

24  National Marine Fisheries Services jointly promulgated the *DPS Policy* to ensure consistency in

25  their respective DPS designations.  61 Fed. Reg. 4722 (1996).  The *DPS Policy* was designed to

26  provide different levels of protection to different populations of the same species.  *See*

27  *Defenders of Wildlife v. Dept. of Interior*, 354 F. Supp. 2d 1156, 1170 (D. Ore. 2005).

28

United States District Court
For the Northern District of California

Under the *DPS Policy,* a DPS must be discrete and significant in relation to the species to which it belongs (61 Fed. Reg. 4725 (1996)).  A population is discrete, in part, if "[it] is markedly separated from other populations of the same taxon as a consequence of physical, physiological, ecological, or behavior factors" (*ibid.*).  If the population is discrete, FWS then considers the "biological and ecological significance" of the populations to the taxon to which it belongs (61 Fed. Reg. at 4724, 4725).  FWS determines the significance of a discrete population by considering the following non-exclusive factors (61 Fed. Reg. 4725):

> (1)    persistence of the discrete population segment in an ecological setting unusual or unique for the taxon;

> (2)    evidence that loss of the discrete populations segment would result in a significant gap in the range of a taxon;

> (3)    evidence that the discrete population segment represents the only surviving natural occurrence of a taxon that may be more abundant elsewhere as an introduced population outside its historic range; or

> (4)    evidence that the discrete population segment differs markedly from other populations of the species in its genetic characteristics.

The ESA and the DPS Policy require FWS to base decisions to list or down-list a DPS on the statutorily prescribed listing factors in Section 4(a)(1).  16 U.S.C. 1533(a); 61 Fed. Reg. 4725.

**B.    "Endangered" versus "Threatened."**

The ESA requires the Secretary of the Interior, through his designee, FWS, to determine whether any species is "endangered" or "threatened."  16 U.S.C. 1533.  A species is "endangered" if "is in danger of extinction throughout all or a significant portion of its range."  16 U.S.C. 1532(6).  A species is "threatened" if it is likely to become an "endangered" species within the foreseeable future throughout all of or a significant portion of its range.  16 U.S.C. 1532(20).

**United States District Court**
For the Northern District of California

FWS must make its determination as to whether a species is "threatened" or "endangered" based on the following factors (16 U.S.C. 1533 (a)(1)):

      (A)     present or "threatened" destruction, modification, or curtailment of its habitat or range;

      (B)     overutilization for commercial, recreational, scientific, or education purposes;

      (C)     disease or predation;

      (D)     inadequacy of existing regulatory mechanisms; or

      (E)     other natural or manmade factors affecting its continued existence.

Determinations of whether a species is "endangered" or "threatened" must be based "solely on the basis of the best scientific and commercial data available . . . after conducting a review of the status of the species . . . without reference to the possible economic or other impacts of such determination."  FWS applies these same five listing factors to determine whether threats to a species have decreased enough to warrant down-listing. 16 U.S.C. 1533(b)(1)(A); 50 C.F.R. 424.11(b).

A designation of "endangered" triggers a broad scope of protection in the form of prohibitions, including prohibiting "takes" under Section 9 of the ESA.  16 U.S.C. 1538.  The term "take" means to "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct.  16 U.S.C. 1532 (19).  The Secretary of the Interior has interpreted the term "harm" to cover "significant habit modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering."  50 C.F.R. 17.3 (2000).  Upon application by an individual, however, FWS may authorize a "take" of a species that is incidental on a case-by-case basis.  16 U.S.C. 1539(a).

A designation of "threatened" triggers Section 4(d) of the ESA. 16 U.S.C. 1533(d).  Section 4(d) states that "whenever any species is listed as a threatened species . . . Secretary shall issue such regulations as he deems necessary and advisable to provide for the conservation of threatened species." 16 U.S.C. 1533(d).  In accordance with Section 4(d), FWS long ago

14

1    promulgated a rule applying full extension of the protective regulations afforded to

2    "endangered" species under Section 9 of the ESA to "threatened" species, subject to later

3    case-by-case modifications.  50 C.F.R. 17.31 (1978).

4           The Section 4(d) rule in question carved out exceptions to the scope of a "taking."

5    Specifically, the Section 4(d) rule exempted livestock ranching activities on private or tribal

6    lands from the "take" prohibitions under Section 9 of the Act, 16 U.S.C. 1538 (69 Fed. Reg.

7    47241).  Routine ranching activities included, but were not limited to, livestock grazing,

8    stock-pond maintenance, and measures to control burrowing rodents near stock ponds and other

9    water bodies (Cen CTS FR 12612-12616).  The rule specifically prohibited certain ranching

10   activities highly detrimental to the tiger salamander such as the use of fumigants to kill

11   burrowing rodents and the introduction into stock ponds of non-native biological organisms that

12   may prey on the tiger salamander (69 Fed. Reg. 47243-44).

### C.    Notice Requirement.

14          FWS cannot issue a final rule implementing any listing "determination, designation, or

15   revision" without first publishing a proposed rule in the Federal Register at least 90 days before

16   the effective date of the final rule and complying with the other notice requirements.  16 U.S.C.

17   1533(b)(5).  Contrary to intervenors' statement of the law, the notice requirements of Section 4

18   are applicable to DPS designations as well as listings.  *Defenders of Wildlife v. DOI*,

19   354 F. Supp. 2d 1156, 1170 (D. Or. 2004).

### D.    Standard of Review.

21          Review of administrative decisions involving the ESA is governed by Section 706 of the

22   Administrative Procedure Act.  *See e.g., Nat'l. Ass'n. of Home Builders v. Norton*, 340 F.3d

23   835, 841 (9th Cir. 2003).  The parties agree that under Section 706, a "reviewing court

24   shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be

25   arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or

26   "without observance of procedure required by law."  5 U.S.C. 706(2)(A)(D).  *Idaho Farm*

27   *Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1401 (9th Cir. 1995).  To determine whether an agency

28   has violated the arbitrary and capricious standard, a court must determine whether the agency

United States District Court

For the Northern District of California

15

articulated a "rational connection between the facts found and the choice made." *Motors Vehicles Mfrs. Ass'n. v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

While the APA demands considerable deference to agency decisions, an agency's decision is arbitrary and capricious if "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that is could not be ascribed to a difference in view or the product of agency expertise." *Ibid.* A district court may uphold a decision of "less than ideal clarity if the agency's path may reasonably be discerned." The reviewing court should not attempt itself to make up for such deficiencies by supplying a reasoned basis for the agency's action that the agency has not given. *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947).

*         *         *

Applying the foregoing, this order holds that (1) the portion of the 2004 rule relating to Central California tiger salamander was neither arbitrary nor capricious, (2) NEPA is inapplicable to the promulgation of a Section 4(d) rule, and (3) the portion of the 2004 rule relating to the Santa Barbara and Sonoma tiger salamanders must be vacated.

### *(1)    Central California Tiger Salamander.*

This order sustains the entirety of the 2004 rule regarding the Central California tiger salamander. *First*, the designation of the Central California tiger salamander as "threatened," is sustained. *Second*, this order holds that the Section 4(d) rule was neither arbitrary nor capricious or otherwise unlawful as applied to the Central California tiger salamander.

### (a)    "Threatened" Status.

Plaintiffs do not challenge the listing of "threatened" for the California tiger salamander. FWS properly noticed the rule. The proposed rule included a summary of the data upon which the proposed rule was based, a showing of the relationship of the data and the proposed rule, and a summary of the factors affecting the Central California tiger salamander. In addition, the final rule included an analysis of the five factors outlined in Section 4(a).

**United States District Court**
For the Northern District of California

There is a clear connection between the analysis and the final determination of "threatened" for the Central California tiger salamander.

**(b)      Section 4(d) Rule.**

Plaintiffs do challenge the Section 4(d) rule applied to the Central California tiger salamander.  Plaintiffs argue that the Section 4(d) rule does "more harm than good" by permitting routine ranching activities that may eliminate salamanders (Pl. Supp. 1).  This, however, is not the applicable standard.  The question is whether the record includes a rational connection between the evidence and rule permitting routine ranching activities to continue.  This order holds that it does.

In the final rule, FWS articulated two reasons in support of the rule.  *First*, FWS argued "easing the general take prohibitions . . . may encourage continued responsible land uses that provide an overall benefit to the species" (69 Fed. Reg. 47241).  *Second*, FWS stated that "stock ponds on livestock ranches for breeding [that] appear to be a critical link in the conservation and recovery of the species" (69 Fed. Reg. 47241).  The agency's rationale is discernible.  The rationale is that development has destroyed the vernal pools historically used by the salamanders.  Salamanders have migrated to stock ponds in response.  To preserve the stock ponds, the rule seeks to cooperate with ranchers to permit ongoing ranching activity so as to preserve ranch land (and thus the stock ponds) rather than providing incentives to sell the land to developers.  No doubt, plaintiffs would like to see more restrictive ranching practices.  But the agency did expressly prohibit two specific types of ranching practices: the introduction of non-native biological organisms that may prey on the tiger salamander into stock ponds and fumigants used to kill burrowing rodents.  Where to draw the line is for the agency to decide, not plaintiffs.  So long as the agency has drawn the line within the zone of reasonableness in light of the statutory goals, its policy choice must be sustained.

While this order holds that the Section 4(d) rule is neither arbitrary nor capricious with regard to the Central California tiger salamander, this order does not suggest that if the down-listing of the Sonoma and Santa Barbara populations were upheld after further administrative proceedings, then the current Section 4(d) rule would automatically pass muster

United States District Court
For the Northern District of California

1    as to those DPSs.  In that case, the agency and the Court would need to analyze the specifics as

2    to those populations.

3                            *(2)       NEPA.*

4          Plaintiffs argue that FWS violated the National Environmental Project Act by adopting

5    the Section 4(d) rule without preparing an environmental impact statement.  NEPA requires

6    federal agencies to prepare a environmental impact statement for "major Federal actions

7    significantly affecting the quality of the human environment."  42 U.S.C. 4332(2)(c).  This

8    order holds that defendants are entitled to summary judgment on the NEPA claim.

9          On recommendation from the Council of Environmental Quality, FWS determined that

10   "Section 4 listing actions are exempt from NEPA as a 'matter of law'" (48 Fed. Reg. 49244

11   (1983)).  A reviewing court is obliged to defer to a federal agency's interpretation of its own

12   statute where Congress has been silent or ambiguous, as long as the agency's interpretation,

13   though perhaps not the one the court would have chose, is at least reasonable enough.

14   *Chevron U.S.A. v. National Resources Defense Council*, 467 U.S. 837, 840 (1984).  This Court

15   must defer to CEQ's view that NEPA is inapplicable to Section 4 actions.  Section 4(d), of

16   course, is within the scope of the Section 4 listing actions — it is only triggered upon the listing

17   of a species as "threatened" pursuant to the substantive and procedural requirements of

18   Section 4.  Accordingly, this order holds that FWS was not required to prepare an

19   environmental impact statement prior to issuing the Section 4(d) rule in question.

20         ESA has its own statutory standards and framework for determining a listing of

21   "threatened" and the concurrent Section 4(d) rule.  The Secretary's determination that a species

22   is "threatened" must be based on the "best scientific and commercial data available to him" as

23   applied to the five statutorily defined factors.  16 U.S.C. 1533(a)(1); 16 U.S.C. 1533 (b)(1)(A).

24   NEPA would, if applicable, confuse matters by overlaying its own independent matrix.  *See*

25   *Pacific Legal Foundation v. Andrus*, 657 F.2d 829, 836 (6th Cir. 1981).  Furthermore, the

26   opportunity for public comment, which is part of promulgation for a listing under the ESA,

27   ensures that information regarding how a listing impacts the public and the environment is part

28

1   of the decision-making process.  Therefore, it would make no sense to overlay the NEPA

2   scheme on top of Section 4.

3   Plaintiffs cite *Ramsey v. Kantor*, 96 F.3d 434 (9th Cir. 1996), to support its position.

4   *Ramsey* is distinguishable.  In *Ramsey*, the Ninth Circuit held that the National Marine Fisheries

5   Service must comply with NEPA prior to issuing an incidental take statement pursuant to

6   Section 7 of the ESA.  *Ramsey* held that the incidental take statement was the functional

7   equivalent of a permit.  *Ramsey*, 96 F.3d at 445.  This order holds, in contrast, that a

8   Section 4(d) rule is not the functional equivalent of a permit.  The issuance of a permit under

9   the ESA entails a wholly different set of procedures than the issuance of a Section 4(d) rule.

10  *Compare* 16 U.S.C. 1533(d) *with* 16 U.S.C. 1539(a).

11              **(3)      *Sonoma and Santa Barbara Populations***

12                          **(a)      DPS.**

13  On the other hand, FWS's elimination of DPS status for the tiger salamander in

14  Sonoma County and Santa Barbara County was, on the record before the agency, arbitrary and

15  capricious, for the following reasons.

16  *First*, FWS did not properly notice a proposal to eliminate the DPS status.  To the

17  contrary, the proposed rule emphasized the distinctiveness of the populations stating that the

18  Central California tiger salamander would be listed as its own DPS as the Sonoma and

19  Santa Barbara populations had previously been (68 Fed. Reg. 28652) (emphasis added):

20              There is *no* evidence of natural interchange of individuals between
            the Sonoma County and Santa Barbara County populations with
21          the Central California tiger salamander . . .  Therefore, the best
            available genetic data (Shaffer and Trenhamn 2002) for California
22          tiger salamanders indicate that the Central California tiger
            salamander *is distinct from* the Sonoma County and Santa Barbara
23          DPSs.

24   The proposed rule went on to state (*id.* at 28653):

25              Because the population segment appears to meet both the
            discreteness and significance criteria of our DPS policy, we
26          propose that the Central California tiger salamander constitutes a
            DPS that qualifies for consideration for listing.

27

28   The final rule, however, did a countermarch.  It eliminated all DPSs.  It merged the three

     populations into a single range-wide species.  This was the *opposite* of the proposed rule.

United States District Court

For the Northern District of California

1    No substantive rationale was given for the change.  Eliminating the DPSs effectively decreased

2    the protection of the salamanders as a whole; the larger the range, the more widely distributed

3    the salamanders, the less likely an analysis of the range as a whole would ever result in a

4    determination of "endangered."  *See Defenders of Wildlife v. DOI*, 354 F. Supp. 2d 1156, 1172

5    (Dist. Or. 2005).

6          *Second*, the decision to eliminate the DPS status was arbitrary and capricious, at least on

7    the present record.  Prior to the publication of the 2004 rule, FWS had already designated the

8    Sonoma and Santa Barbara California tiger salamanders as "distinct population segments."

9    FWS found that the populations in Santa Barbara and Sonoma counties *were* "discrete" and

10   "biologically and ecologically significant" to the species because the loss of this population

11   would "result in the loss of a significant genetic entity and the curtailment of the range of the

12   species as a whole" (65 Fed. Reg. 57242; 68 Fed. Reg. 13498).

13         The final rule was bereft of any analysis.  It stated in a conclusory fashion:  "having

14   determined that the Santa Barbara and Sonoma populations have the same listing status as the

15   taxon as a whole, we are removing these populations as separately listed DPSs" (69 Fed. Reg.

16   47241).  The prior finding of discreteness was ignored.  The prior finding of biological and

17   ecological significance was ignored.  Brute force and *ipse dixit* were substituted without even a

18   semblance of agency reasoning.

19         FWS's response to comment 46 in the final rule is illustrative (69 Fed. Reg. 47228):

20              Comment 46: Numerous commentators stated that the Service
               failed to demonstrate that the Santa Barbara or Sonoma
21              populations of California tiger salamander satisfy the discreteness
               or significance criteria of the [*DPS Policy*].  Other commentators
22              contended that available scientific information on the genetics of
               the California tiger salamander indicated a significant degree of
23              genetic distinction of the Santa Barbara or Sonoma County
               populations . . ."

24
               FWS's response: In this rule, we list the California tiger
25              salamander as "threatened" throughout its range, and eliminate the
               separate listings for the Santa Barbara and Sonoma populations.
26

27   FWS's response was clearly non-responsive.  FWS now acknowledges as much by now asking

28   for a remand to create a better record.  For the foregoing reasons, this order finds that the final

20

1   rule with regard to the elimination of the DPS designation for the Sonoma and Santa Barbara

2   tiger salamander was both substantively and procedurally flawed.

3                              **(b)      Down-listing.**

4            Contrary to plaintiffs' contention, this order finds that FWS did adequately notice, albeit

5   cursorily, down-listing the Santa Barbara and Sonoma County DPSs by stating in the preamble

6   of the proposed rule, "we propose reclassifying these populations as threatened" (68 Fed. Reg.

7   28648).

8            On the other hand, as plaintiffs argue, neither the final rule nor the record indicate any

9   discernible path regarding *why* FWS eventually down-listed the populations. Unlike the former

10  rules listing the Santa Barbara and Sonoma populations as "endangered" species, the 2004 rule

11  did not analyze the five listing factors in 16 U.S.C. 1533(a)(1) with regard to down-listing the

12  California tiger salamander in Sonoma and Santa Barbara counties, let alone explain why the

13  five-factor test had changed in its application (69 Fed. Reg. 47240). The only explanation

14  provided by FWS regarding the down-listing is the conclusory comment that "analysis of the

15  species range-wide has shed additional light on the status of the Santa Barbara and Sonoma

16  populations" (*id.* at 47241). There was no scientific evidence cited for down-listing the Sonoma

17  and Santa Barbara tiger salamanders in the final rule. The only additional information that was

18  offered in the 2004 rule refers to "new information [that] suggests that additional locations of

19  occupied salamander habitat exist in these areas" (69 Fed. Reg. 47321). The agency did not

20  provide any scientific evidence to explain the extent of "new information" nor does the rule

21  develop a correlation between this "new information" and down-listing.

22           FWS's own scientific review team strongly supported the "endangered" status of the

23  Sonoma and Santa Barbara populations. After issuing the proposed rule raising the issue of

24  down-listing the California tiger salamander, the team met periodically, beginning in 2003, to

25  review the scientific data, as it related to the proposed reclassification. At a meeting regarding

26  the final rule in December 2003, the team was asked to rank the overall likelihood of extinction

27  of the Santa Barbara and Sonoma salamanders on a scale from "very low" to "very high." In

28  response, the team ranked the likelihood of extinction of the Sonoma County salamander as

United States District Court

For the Northern District of California

United States District Court
For the Northern District of California

"very high" and the Santa Barbara County salamander as "high or very high" (Cen CTS FR 11826).  When asked to rank the species as "endangered" or "threatened," *all* members of the team designated the Santa Barbara and Sonoma salamander as "endangered;" all six members ranked their confidence in an "endangered" listing as "very high" for the Sonoma County DPS and, with regard to the Santa Barbara County DPS, five members ranked their confidence in an "endangered" listing as "high" and one member ranked his confidence as "very high" (Cen CTS FR 11829).

Independent scientific opinion from outside of FWS also opposed reclassification.  The following comment by Dr. Bradley underscored the problem (Cen CTS FR 2354-2355):

> In a truly bizarre addition to the generally excellent proposed rule, the final pages of the document suggests down-listing the Santa Barbara and Sonoma County DPSs from "endangered" to "threatened."  Included in this proposed down-listing is to apply the special rule exemption to normal ranching as outlined above.  This critically important change is given about one page of text, references no science that has been added since these two DPSs were listed, and provides virtually no sound reason why it should be taken seriously . . .  Santa Barbara and particularly Sonoma are absolutely critical.  There is no room to maneuver, because both DPSs are on the brink of extinction.

Finally, the twists and turns between May 2003 and July 2004 showcase the irregularity involved.  The scientific review team decided against down-listing the Sonoma and Santa Barbara salamander.  It did so after considering and analyzing the proposed rule for the year-long comment period.  Nonetheless, they were overruled and directed to eliminate the DPS and down-list the species.  A revised rule was then drafted on a compressed schedule.  Internal memorandums indicate that the scientific review team struggled to draft a rule to draw a discernible path from their own scientists' analysis to the ordained outcome.  A memorandum of a telephone conversation from a staff member with Julie MacDonald stated that, "Julie thinks Central, SB and Sonoma should be un-DSP'd [and] SB [and] Sonoma are not significant (even though genetics state otherwise)" (SC CTS 4154).  An internal email circulated to the team regarding the final rule stated, "[regarding] what we are doing, and the explanation for it, these things are highly nuance . . . how we describe what we did, and why, is still being crafted; it is a very sensitive topic for the Department" (Cen CTS FR 10896).

22

This is not to suggest that the Secretary of Interior has no role in the ultimate decision. If the Secretary wants to re-assess the evidence, he may choose to, but, in doing so, he must set forth a discernible rationale.

Intervenors attempt to supply a rationale. They argue that the down-listing of the salamander populations was based on the "best scientific and commercial data available" because in 2004 there was new evidence of a far greater number of breeding ponds (Def. Brief at 20). The record, however, indicates that as early as September of 2003, during the comment period of the proposed rule, the regional CTS team was already aware of the additional breeding ponds of both the Santa Barbara and Sonoma populations (Cen CTS FR 11848, 11849, 11854 (record of 46 breeding ponds for the SB salamander), Cen CTS FR 11829 (record of 36 breeding ponds for the Sonoma salamander); yet, the scientific review team, in analyzing the threats to the Santa Barbara salamander continued to rank the populations as "endangered" (*supra* at 22-23). This post-hoc suggestion does not withstand scrutiny.

For the foregoing reasons, this order holds that FWS's down-listing of the Santa Barbara and Sonoma County DPSs was arbitrary and capricious and must be set aside.

    **3.**    **RELIEF.**

Having decided that a portion of the final 2004 Rule is invalid, the Court now turns to the issue of relief. The question is whether to *vacate* the rule (in part) or *retain* the rule pending the agency's decision upon remand. If the rule is vacated, the prior "endangered" status will be revived as to the Santa Barbara and Sonoma counties.

Ordinarily, when a regulation is not promulgated in compliance with the APA, the regulation is invalid. *See Idaho Farm Bureau Federation v. Babbitt*, 58 F.3d 1392, 1405 (9th Cir. 1995). Therefore, "vacatur of an unlawful agency rule normally accompanies a remand." *Alsea Valley Alliance v. Department of Commerce*, 358 F.3d 1181, 1185 (9th Cir. 2004). An exception to this rule exits when equity demands. For example, in *Idaho Farm Bureau Federation*, the Ninth Circuit declined to vacate an invalid "endangered" listing because vacating the rule would eliminate protection for the species, which was on the brink of extinction. *Idaho Farm Bureau v. Babbitt*, 58 F.3d 1392, 1405 (9th Cir. 1995).

1    Courts have identified the following factors controlling the equitable decision to vacate

2 or retain the defective rule during remand:

3          (1)     the consequences of invalidating or enjoining the agency action.

4          (2)      potential prejudice to those who will be affected by maintaining

5    the status quo.

6          (3)     the magnitude of the administrative error and how extensive and

7    substantive it was.

8          (4)     the purposes of the substantive statute under which the agency was

9    acting.

10 *See e.g., Natural Res. Def. Council v. Dept. of Interior*, 275 F. Supp. 2d 1136, 1144 (C.D. Cal.

11 2002) (citations omitted).

12    Contemplating these factors, this order holds that the 2004 rule should be vacated.  The

13 parties appear to agree that there would be little on-the-ground impact of ranching activities after

14 a vacatur.  There is, for example, no evidence that the "endangered" listing of the Santa Barbara

15 and Sonoma salamanders curtailed any ranching in those counties during the period of time that

16 they were listed as "endangered" (Pl. Supp. 4).  Any rancher, moreover, may seek an incidental

17 take permit pursuant to Section 9.  In the Court's view, a return to "endangered' status in these

18 two counties will not prejudice the ranching activities in those counties.  Finally, the irregular

19 way in which the down-listing occurred counsels in favor of vacatur.  It would be unseemly for a

20 court to leave in place a rule that was so riddled with error.  Also, for these reasons (and that the

21 agency had ample time to properly evaluate its listing decision), it would be unseemly to allow a

22 voluntary remand as requested by the agency.

23

24

25

26

27

28

**United States District Court**
For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CONCLUSION**

For the foregoing reasons, plaintiffs' motion for summary judgment is **DENIED AND GRANTED IN PART** and defendants' cross-motion for summary judgment is **DENIED AND GRANTED IN PART**, as follows:

      1.     The 2004 rule, including the Section 4(d) relief, is sustained as to all but the Sonoma and Santa Barbara DPSs.  This part of the rule remains effective.

      2.     As to the Santa Barbara and Sonoma DPSs, the 2004 rule is vacated without prejudice to any new rule-making concerning them.  In the meantime, the prior "endangered" listing of the Santa Barbara and Sonoma DPSs shall apply.

      3.     The matter is remanded to the agency for any further rulemaking and the Court will retain jurisdiction over any review thereof.

**IT IS SO ORDERED.**

Dated:  August 18, 2005.



WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE